***********
The Full Commission reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Stephenson and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award. Accordingly, the Full Commission affirms the Opinion and Award of Deputy Commissioner Stephenson with modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in a pretrial agreement as:
 STIPULATIONS
1. All parties are properly before the Industrial Commission and the Commission has jurisdiction over the parties and of the subject matter.
2. All parties have been correctly designated, and there is no question as to misjoinder or nonjoinder of parties.
3. The parties were subject to the North Carolina Workers' Compensation Act at the time of the alleged occupational disease.
4. An employee/employer relationship existed between the parties at the time of the alleged occupation disease.
5. The employer in this case is Tyco Healthcare/Mallinkrodt, and the servicing agent liable on the risk is Sedgwick CMS.
6. The plaintiff allegedly sustained an occupational disease and began losing time from work on or about October 10, 2002.
7. The plaintiff's average weekly wage as determined from the Form 22 is $837.59, yielding a compensation rate of $558.39.
8. The plaintiff was paid the entire day of the alleged occupational disease.
9. The plaintiff last worked for Tyco/Mallinkrodt, Inc. on or about October 10, 2002.
10. The parties' proposed issues for determination are as follows:
(a) Whether the plaintiff sustained or contracted a compensable occupational disease as a result of her working for Tyco Healthcare/Mallinkrodt; and,
(b) Whether the plaintiff is entitled to medical and/or indemnity benefits, and if so, to what extent.
11. In addition to the deposition transcripts of Dr. Wheeless, Dr. Guisto, Dr. Edwards, Donna Timberlake, and Michael Dera, the parties stipulated into evidence the pretrial agreement dated November 6, 2003, and the following:
(a) The plaintiff's medical records in regard to the claim marked as stipulated exhibit 2;
(b) The plaintiff's responses to the defendants' first set of interrogatories and requests for the production of documents marked as stipulated exhibit 3;
(c) The defendants' responses to plaintiff's first set of interrogatories, request for production of documents marked as stipulated exhibit 4;
(d) All I.C. Forms filed in the matter marked as stipulated exhibit 5; and,
(e) A Form 22 wage statement marked as stipulated exhibit 6.
12. Following the hearing before the Deputy Commissioner, the parties stipulated to the admittance of two additional submitted videotapes.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. The plaintiff was 46 years old, and residing in Louisburg, North Carolina, at the time of hearing before the Deputy Commissioner.
2. The plaintiff was hired by defendant-employer on April 19, 1982, as a production operator. She was employed in that position for approximately ten years, when she was transferred and given the title of component production operator. The plaintiff continued in that capacity for approximately ten years.
3. The defendant-employer's business includes the production of medical supplies in mass quantities for distribution based on order sizes.
4. The plaintiff testified that she worked in the syringe-filling department, where her job was to sterilize and process the components of syringes.
5. The position required that the components be unboxed and taken into the sterile core, where they were washed, sterilized, rinsed, assembled, and put into the autoclave.
6. The plaintiff testified that her main job function was at the machine that assembles the syringe components in the sterile room. The plaintiff would stand at the assembler and continuously see that several components traversed the two conveyor belts at all times. This job duty required continuous, repetitive movements of plaintiff's fingers, hands, wrists, and arms.
7. The plaintiff further testified that she spent eight out of every ten hours each day on this machine.
8. Donna Timberlake, the plaintiff's co-worker, testified that plaintiff spent about eighty percent (80%) of her time working at the assembler machine and that Ms. Timberlake would handle the rest of the duties required to make their production in the sterile room.
9. The records provided by the defendant-employer indicated that during the month of September 2002 the plaintiff spent approximately seventy-one percent (71%) of her time at the assembler machine and corroborated that Ms. Timberlake was performing the remaining duties. Michael Dera substantiated the defendant-employer's records.
10. On October 10, 2002, the plaintiff noticed that she had decreased strength in her hands while performing her job duties. The plaintiff reported this occurrence to her supervisor, Charles Yapp, and then clocked out to see her own physician, Dr. William A. Sayles.
11. The plaintiff was evaluated by nurse practitioner Joyce Neff, who was under the impression that plaintiff may have carpal tunnel syndrome. The plaintiff was instructed to wear wrist splints.
12. Because the plaintiff was recommended to wear wrist splints, she was not allowed to return to work in her normal position. The plaintiff's claim was not accepted by defendants and defendant-employer did not offer to the plaintiff light-duty work within her work restrictions. The plaintiff's last day with the defendant-employer was October 10, 2002.
13. On November 7, 2002, the plaintiff came under the care of Orthopaedic Specialists of North Carolina and was evaluated by physician assistant Marvin Rainwater. After evaluation, PA Rainwater indicated that the plaintiff had bilateral wrist pain of unknown etiology. The plaintiff was prescribed Mobic and advised to begin stretching exercises. The plaintiff was restricted from doing repetitive work with her hands and arms by PA Rainwater.
14. On November 26, 2002, the plaintiff returned to Orthopaedic Specialists of North Carolina, where she was seen again by PA Rainwater and was noted to have continuing complaints of pain in her arms; however, her pain on this occasion was more notably in her forearms as opposed to her wrists. She was given an injection of Triamcinolone and given more samples of Mobic. Once again, the plaintiff was restricted from doing repetitive work with her hands and arms.
15. On December 13, 2002, the plaintiff returned again for evaluation at Orthopaedic Specialists of North Carolina. PA Rainwater recommended an EMG study to be performed on the plaintiff because of continued complaints of wrist and forearm pain. The plaintiff was taken out of work completely after this evaluation.
16. On December 31, 2002, the plaintiff returned to Orthopaedic Specialists of North Carolina indicating that she was having difficulty with her shoulders as well as her wrist and forearms. The plaintiff was then placed on Arthrotec.
17. On February 21, 2003, the plaintiff returned to Orthopaedic Specialists of North Carolina for review of her EMG study, which was essentially normal except for slight prolongation for the distal motor latency in the left ulnar nerve suggestive of minimal entrapment at the wrist. The plaintiff was instructed to continue Arthrotec and to begin physical therapy.
18. On April 22, 2003, the plaintiff returned to Orthopaedic Specialists of North Carolina for evaluation. She stated that she was having neck discomfort and still continued to have forearm discomfort. PA Rainwater referred the plaintiff for a cervical MRI.
19. On May 9, 2003, the plaintiff returned to Orthopaedic Specialists of North Carolina where it was indicated that the work-ups performed on the plaintiff had not given a conclusive diagnosis of the plaintiff's condition.
20. On July 8, 2003, Dr. Clifford Wheeless of Orthopaedic Specialists of North Carolina, the plaintiff's treating physician, responded to written questions sent to him by the plaintiff's attorney. In his response he diagnosed the plaintiff as having bilateral forearm pain, left greater than right. Dr. Wheeless responded to a reasonable degree of medical certainty that the plaintiff's forearm pain most likely resulted from her repetitive work duties, but that he has not been able to document an exact disorder based on the medical tests. He further responded that the plaintiff's job required repetitive motion and, thus, exposed her to a higher risk of contracting bilateral forearm pain as opposed to the general public not so employed.
21. On September 29, 2003, the plaintiff returned to Orthopaedic Specialists of North Carolina for a follow-up visit and was seen again by PA Rainwater. The plaintiff's main complaint was left elbow pain. The plaintiff received an injection of 30mg Triamcinolone, and was told to continue the use of Bextra twice daily.
22. On October 30, 2003, the plaintiff again returned to Orthopaedic Specialists of North Carolina for bilateral elbow and wrist pain, and was evaluated by Dr. Wheeless. Dr. Wheeless informed plaintiff to continue taking the Bextra and referred the plaintiff to Dr. John Guisto, a chronic pain physician.
23. On November 25, 2003, the plaintiff was seen by Dr. Guisto at The Carolina Center for Physical Medicine. The plaintiff complained of medial elbow pain that radiates on the left anteriorly as far as the wrist and up into the shoulder, and some pain on the right anteriorly, mostly at the wrist. Dr. Guisto opined that the plaintiff's upper extremities have a sensation disturbance probably stemming from years of overuse when she worked. Dr. Guisto performed acupuncture on plaintiff at several points and one point seemed to make a difference.
24. On February 9, 2004, the plaintiff returned once again to Orthopaedic Specialists of North Carolina for re-examination of chronic left forearm pain and again saw PA Rainwater.
25. On February 19, 2004, the parties took the deposition of Dr. Wheeless. Dr Wheeless was asked by the plaintiff's counsel if he had an opinion to a reasonable degree of medical certainty as to whether the plaintiff's job caused the condition for which she was treated. Dr. Wheeless replied that it's certainly possible that the plaintiff's job caused her condition, and that he thought "probable" would not be out of line. The Full Commission finds that opinions of Dr. Wheeless to be credible and accepted as fact.
26. Dr. Wheeless further testified that it is very reasonable that the position the plaintiff worked, which he viewed on videotape, exposed the plaintiff to either contracting or having aggravation of her condition, and that his basis for this opinion was that the repetitive activity could certainly aggravate a pre-existing condition. Lastly, Dr. Wheeless testified that he did not think the plaintiff would be fit to return to that type of job.
27. On August 4, 2004, the parties took the deposition of Dr. Guisto. The plaintiff was referred to Dr. Guisto by Dr. Wheeless. Dr. Guisto testified that it was his impression that the plaintiff had soft tissue pain, myofascial, with some sensation disturbance; in other words, chronic pain traveling in the sensory nerves from a repetitive motion overuse type of injury.
28. Dr. Guisto was allowed to review the videotape of the plaintiff's position. He testified that the segment he viewed showed job requirements that included: (1) repetitive use of the upper extremities; (2) repetitive finger movements required to place the syringe tips into a holder; (3) repetitive use of the hands; and, (4) required standing while keeping the elbows bent and unsupported, which can cause repetitive injury.
29. Dr. Guisto testified that in the absence of any other factors that would have influenced plaintiff, it was his opinion to a reasonable degree of medical certainty that the plaintiff's job caused the condition for which he treated her.
30. Dr. Guisto further testified that it was his opinion to a reasonable degree of medical certainty that the plaintiff's job exposed her to a higher risk of contracting myofascial pain syndrome or overuse syndrome than a member of the general public.
31. Dr. Guisto also testified that at the time he saw the plaintiff, given her condition, it would not be medically advisable for the plaintiff to return to that type of work without some sort of treatment and improvement.
32. On June 27, 2003, Dr. George Edwards of the Raleigh Hand Center wrote a letter responding to specific questions from counsel for the defendants. Dr. Edwards was hired by counsel for the defendants for the purpose of an independent medical examination or defense medical examination. Dr. Edwards reviewed the plaintiff's medical records and the lengthy videotape of the plaintiff's position with defendant-employer. Dr. Edwards wrote that he felt that if an individual performed this type of job for more than two hours at a time without a break, or more than four to five hours a day, then it might be considered the type of job that could cause some repetitive strain of the flexor tendons in the fingers and flexor muscles in the forearms and possibly contribute to carpal tunnel syndrome.
33. On August 19, 2004, the parties took the deposition of Dr. Edwards. As he had previously written in his letter to defense counsel, after reviewing the portion of videotape where the individual stands for a prolonged period of time and uses both hands to sort small objects into a metal bin, Dr. Edwards testified that it showed an individual using finger flexors in a fairly repetitive fashion, even though it didn't appear to involve much force or strain and if an individual that has a tendency towards inflammation or tendonitis were to do that type of job for a prolonged period of time, i.e., on the order of two hours or more without a break, then it was his opinion that there would be some increased risk of developing tendonitis.
34. Dr. Edwards also testified that he felt if an individual was performing the position in the videotape for four to five hours a day then there would be implications for tendon problems. He explained that once a person hit the four or five hour per day limit of using the same finger flexor muscles, then they seem to be at a higher risk for developing repetitive motion problems.
35. Dr. Edwards further testified that if the plaintiff performed the position in the videotape where the individual stood at the machine, and using the time guidelines he recited in his June 27th letter, if those times were exceeded, then it is more likely than not that the plaintiff's job did contribute to her symptoms.
36. Dr. Edwards also testified that that based on the information in the plaintiff's medical records, a useful term for the plaintiff's condition would be hand and forearm pain, but felt the basic diagnosis would be tendonitis.
37. Dr. Edwards testified that if the evidence shows that the plaintiff worked more than four to five hours a day, or she worked longer than two hours without a break, at the particular job sorting objects that were fed onto the small conveyor belt, than more likely than not the job would be a significant contributing factor to the plaintiff's symptoms, and at the very least the job would aggravate a pre-existing condition.
38. Dr. Edwards testified that the treatment regimen for a patient with tendonitis would be to avoid activities that aggravate the pain, sometimes splints, sometimes cortisone injections, and various anti-inflammatory medications.
39. Lastly, Dr. Edwards testified that the opinions he rendered in his June 27, 2003, report and during his deposition were rendered to a reasonable degree of medical certainty based upon his training, experience, and clinical practice.
40. The plaintiff testified that she has attempted to seek employment, but given her work restrictions, her education, and her lack of experience outside of the medical supply industry, she has been unable to obtain employment. The Full Commission finds that the plaintiff has made a reasonable, though unsuccessful, job search.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. As of October 10, 2002, the plaintiff contracted a compensable occupational disease and/or aggravated a pre-existing condition by virtue of her prolonged and repetitive hand and arm movements in the course of her employment with the defendant-employer. N.C. Gen. Stat. § 97-53(13).
2. A claimant may prove disability through the production of evidence that the claimant is capable of obtaining some employment but, after a reasonable effort, has been unable to obtain employment. Russell v. LowesProduct Distribution, 108 N.C. App. 762, 425 S.E.2d 454 (1993). In the present case, the plaintiff has shown that after a reasonable effort, she has been unable to obtain employment and, thus, continues to be disabled pursuant to the Workers' Compensation Act. Id.
3. As a result of her compensable occupational disease and/or aggravation of a pre-existing condition by virtue of her prolonged and repetitive hand and arm movements in the course of her employment with defendant-employer, the plaintiff has sustained temporary total disability from October 10, 2002, through the date of the hearing before the Deputy Commissioner and continuing. N.C. Gen. Stat. § 97-29.
4. The plaintiff has received medical treatment that was reasonably necessary to effect a cure, give relief, or lessen the period of her disability. N.C. Gen. Stat. §§ 97-2(19) and 97-25.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. The defendant shall pay to the plaintiff temporary total disability benefits at the rate of $558.39 per week beginning October 10, 2002, and continuing until further Order of the Commission, subject to the attorney's fee approved herein. The portion of such compensation that has accrued shall be paid in a lump sum.
2. The defendants shall provide for all related medical compensation that was or is reasonably necessary to effect a cure, give relief, or lessen the period of the plaintiff's disability.
3. The defendants shall pay directly to the plaintiff's counsel a reasonable attorney's fee of twenty-five percent (25%) of the total compensation awarded herein to the plaintiff. The portion of this fee that has accrued shall be paid to the plaintiff's counsel in lump sum; thereafter, the plaintiff's counsel shall receive every fourth check of disability compensation owed to the plaintiff.
4. The defendants shall pay the costs of this proceeding.
This 29th day of August 2005.
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER